**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **UNDER SEAL,**<br><br>              Plaintiffs,<br><br>       v.<br><br>**UNDER SEAL,**<br><br>              Defendants. | 2:25-cv-02613-DCN<br><br>Case No.: _____ (SEALED)<br><br>COMPLAINT AND JURY DEMAND<br><br>**UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |

**QUI TAM COMPLAINT**
**SEALED CASE—DO NOT ENTER ON PACER**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **UNITED STATES** *ex rel.* **Britny Catlett and Christopher Catlett,**<br><br>Plaintiffs/Relators,<br><br>v.<br><br>**DR. AMAR MOHAN, M.D.; SIP CARE MANAGEMENT, LLC, *et al.,***<br><br>Defendants. | 2:25-cv-02613-DCN<br><br>Case No.: _____ (SEALED)<br><br>COMPLAINT AND JURY DEMAND<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |

<u>**QUI TAM COMPLAINT**</u>

**INTRODUCTION**

1.     For nearly a decade, Dr. Amar Mohan and the Defendant entities have fraudulently billed Medicare for chronic care management that was not provided to patients in Georgia, South Carolina, and Indiana. Under Defendants' policy, a team of physicians and nurse practitioners visits geriatric care facilities and enrolls Medicare patients for chronic care management (CCM) services. But neither Dr. Mohan nor those providers actually provide such services—indeed, often the patients do not need CCM services and have not consented to them. After sign-up, these patients are neglected and used merely as a source of monthly revenue, with medical assistants perfunctorily opening and closing thousands of patient notes per month to fabricate the appearance of patient care. These fraudulently obtained funds are redistributed quarterly to providers as "CCM bonuses"; the remainder of the profits go to Dr. Mohan and the private equity firm that invests in the Defendant entities.

2

2.    In July of 2020, Dr. Mohan took his fraudulent CCM scheme a step further, using a "bot" created by his in-house IT specialist to generate template notes and document activities that never took place. Some of his employees call this process "bot-prepping." All CCM notes since then have been generated using this bot, the most recent iteration of which is called SamePage.

3.    Dr. Mohan and the Defendant entities have several other schemes by which they fraudulently obtain money from Medicare. From 2017 until 2023, Dr. Mohan and the providers at the Defendant entities operated under a blanket policy whereby all visits to patients in skilled nursing facilities (no matter how routine or perfunctory) were fraudulently upcoded to the highest level of complexity (CPT Code 99310). Dr. Mohan has also developed a fraudulent scheme to increase the patient census of his hospice companies, using a "shadow" employee to visit facilities and refer himself patients in violation of the Anti-Kickback Statute.

4.    Providers who complain that Dr. Mohan's actions are unethical and unlawful are retaliated against. Dr. Mohan is notoriously vindictive. He has spread false rumors about former employees to prevent them from being hired elsewhere, berated them with sexualized language, and used anonymous texting applications to hound and threaten them. Dr. Mohan retaliated against both Relators in this case personally, both by taking their jobs and by threatening legal action.

5.    Relators are a current employee and a former employee who witnessed these fraudulent schemes in action. Through these fraudulent schemes and others, Dr. Mohan and his entities have caused the United States to pay millions of dollars in false claims.

6.    This is an action brought by Relators on behalf of themselves and the United States to recover treble damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. §§

3729-33, based on Defendants' false statements to the United States and false claims Defendants submitted or caused to be submitted to the United States for services to Medicare beneficiaries.

## JURISDICTION AND VENUE

7.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a). The acts proscribed by 31 USC § 3729(a) and described in this complaint occurred in this district and elsewhere in the United States.

8.      Venue lies in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), (c), because many of the Defendants are qualified to do business in the state of South Carolina, transact substantial business in the state of South Carolina, transact substantial business in this judicial district, and can be found here. Additionally, and as described herein, many of the Defendants committed acts proscribed by 31 U.S.C. § 3729 within this judicial district. Specifically, Defendants submitted and caused to be submitted within this judicial district false claims.

9.      Additionally, Defendants are all alter egos of Dr. Mohan and the venture capital firm that invests in his businesses. Dr. Mohan exercises such dominion and control over these Defendants that venue is proper and jurisdiction appropriate over all of them in this District. This District may import the contacts of any one entity in the alter ego structure to all others.

## PARTIES

10.      Defendant Dr. Amar Mohan is a physician practicing internal medicine and residing primarily in North Carolina. All of the defendant entities below (except for InTandem Capital) are ultimately under the control of Dr. Mohan, who reports to Janice Rahm, the managing director at InTandem Capital, the private equity firm in New York that invests in these entities. Dr. Mohan is

4

licensed to practice medicine in Georgia, South Carolina, and Indiana. His NPI number is 1578724886.

11.     Defendant InTandem Capital Partners, LLC is a Delaware limited liability company.

**All Entities**

12.     Dr. Mohan is on the Board of Directors and is the Chief Operating Officer and has an ownership stake in all the below entities along with InTandem Capital. Janice Rahm (of InTandem) is the CEO. Bob Anderson was the CFO until mid 2024. The Chief of Compliance is Kelly Murray.

**Georgia-based Entities**

13.     Defendant Transitional Care Physicians of Georgia, P.C., ("TCP") is a Georgia corporation headquartered in Atlanta, Georgia. Dr. Mohan created TCP in April of 2013. It uses NPI Number 1619317542. Until 2024, it employed dozens of providers under Dr. Mohan's control. Dr. Mohan discontinued using TCP as his primary billing entity in the spring of 2024 because "TCP had too many skeletons in the closet" (his words). Specifically, when InTandem Capital was negotiating purchasing an ownership interest in TCP, InTandem informed Dr. Mohan that TCP had "overutilized" high complexity codes and was at risk of an audit by Medicare. TCP operated under the brand name "Traditional Care Physicians of America," with a website at www.tcpamd.com. TCP has operated in Georgia, South Carolina, and Indiana.

14.     Defendant Chronic Disease Management Of Georgia LLC is a Georgia limited liability company created by Dr. Mohan in 2013. It uses NPI Number 1699300939. CDM was used by Dr. Mohan and other specialists to bill Medicare since approximately 2019. In early 2024, Dr.

5

Mohan began using CDM instead of TCP to bill Medicare for all providers (not merely specialist) because "TCP had too many skeletons in the closet" (his words).

15. Defendant SIP Care Management of Georgia, LLC, is a Delaware limited liability company operating in Georgia and headquartered in New York City, New York. SIP Care Management of Georgia is registered to do business in Georgia and was formed in February 2023. In early 2024, Dr. Mohan began using SIP Care Management of Georgia to pay administrative staff (non-providers) in Georgia.

**South Carolina-based Entities**

16. Defendant SIP Care Management, LLC, is a Delaware limited liability company operating in South Carolina and headquartered in Rock Hill, South Carolina. It is registered to do business in South Carolina in January of 2022. SIP Care Management, LLC does some business as "Providence Care" and operates Providence Hospice (which was called Pathway Hospice until 2024). Providence Care's website lists locations in Rock Hill, Simpsonville, and Greenwood, South Carolina, as well as Monroe, GA (at the same Monroe address as other Defendant entities). SIP Care Management is the *de facto* successor of Providence Care LLC. SIP Care Management acts as the overarching entity paying the salaries of all administrative staff and providers in South Carolina. Dr. Mohan is on the Board of Directors and has an ownership stake in SIP Care Management along with InTandem Capital.

17. Defendant Providence Care LLC is a South Carolina limited liability company headquartered in Rock Hill, South Carolina. Providence Care LLC effectively ceased to function when it and TCP were merged to form Defendant SIP Care Management and Defendant SIP Care Management of Georgia.

6

18.    Defendant Providence House Calls LLC is a South Carolina limited liability company headquartered in Rock Hill, South Carolina. Dr. Mohan uses this entity as a feeder for Providence Hospice. Dr. Mohan is on the Board of Directors and has an ownership stake in Providence House Calls LLC along with InTandem Capital. It uses NPI Number 1689912495. Bob Anderson is an officer of this entity.

**Organizational Chart**

19.    Below is a timeline reflecting the associations between the Defendant entities:

**2017**: Dr. Mohan begins using "Transitional Care Physicians of GA, PC" dba Transitional Care Physicians of America (TCP) to bill for Chronic Care Management (CCM), listing himself as rendering provider.

**2020**: Dr. Mohan begins using Chronic Disease Management of Georgia, LLC (CDM of GA) to bill for certain CCM and patient visits.

**2021**: InTandem Capital purchases Providence Care (d/b/a Providenc Care House Calls, Providence Care Home Health, and Providence Care Hospice) in South Carolina. Dr. Mohan opens Pathways Hospice LLC in Georgia.

**2023**: Dr. Mohan receives financing from InTandem Capital for TCP, Pathways Hospice, and SamePageMD (the "bot" described in this complaint). InTandem creates SIP Care of Georgia Management LLC so that former TCP providers can begin using it in the hopes of avoiding a Medicare audit based on "skeletons in the closet" at TCP.

**2024**: Pathways Hospice is renamed "Providence Care Hospice" to match the South Carolina entities. All administrative and non-provider staff from TCP are transferred to SIP Care of Georgia. Dr. Mohan expands use of CDM of Georgia for billing for CCM services.

**Relators**

20.     Relator Britny Catlett is an adult U.S. citizen living in Georgetown, South Carolina. Ms. Catlett worked for TCP from 2016 to 2023 and for SIP Care from 2024 to January of 2025, most recently as Vice President of Operations. Ms. Catlett is a licensed Practical Nurse (LPN) by training, and also has an M.B.A. in Healthcare Management.

21.     Relator Chris Catlett is an adult U.S. citizen living in Georgetown, South Carolina. Mr. Catlett worked as a lead billing and Audit/Revenue Specialist for TCP from April 2021 until March 2025, when his employment was abruptly terminated.

## DISCLOSURE

22.     Prior to filing this Complaint, Relator voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relator is the original source of the information for purposes of that section. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided that information to the Government before filing this Complaint. Relator is serving contemporaneously herewith a statement of the material evidence in their possession upon which his claims are based.

## BACKGROUND

**MEDICARE (BACKGROUND)**

23.     Through the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, the United States provides health insurance coverage for eligible citizens. The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.

24.     An individual may be entitled to Medicare coverage based on his or her age, disability, or affliction with end-stage renal disease. 42 U.S.C. § 426. Individuals who are insured under Medicare are referred to as Medicare "beneficiaries."

25.     There are four Parts to the Medicare Program: Part A authorizes payment for institutional care, including inpatient hospital care, skilled nursing facility care, and home health care, see 42 U.S.C. §§ 1395c-1395i-4; Part B primarily covers outpatient care, including physician services and ancillary services, see 42 U.S.C. § 1395k; Part C is the Medicare Advantage Program, which provides Medicare benefits to certain Medicare beneficiaries through private health insurers, called Medicare Advantage Organizations ("MAOs"), *see* 42 U.S.C. § 1395w-21, *et seq.*; and Part D provides prescription drug coverage, see 42 U.S.C. § 1395w-101, et seq.; 42 C.F.R. § 423.1, *et seq.*

**Medicare Part B (Background)**

26.     CMS contracts with Medicare Administrative Contractors ("MACs") to assist in the administration of Medicare Parts A and B. *See* Fed. Reg. 67960, 68181 (Nov. 2006). MACs generally act as CMS's agents in reviewing and paying Part A and Part B claims submitted by healthcare providers and perform administrative functions on a regional level. See 42 C.F.R. § 421.5(b); *see also* 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.

27.     Under Medicare Part B, a physician may submit claims for reimbursement using either a hard copy or electronic CMS 1500 form. In doing so, the physician must certify that he/she has knowledge of Medicare's requirements, and that the individual claim complies with applicable laws and regulations.

**Medicare Part C (Background)**

9

28. Under Medicare Part C, the Government pays each MAO a fixed monthly payment for each Medicare beneficiary enrolled in the MAO's plan. The Government adjusts these payments for various risk factors that affect expected healthcare expenditures, including the health status of each enrollee. The adjustments are intended to ensure that MAOs are paid more for those enrollees expected to incur higher healthcare costs and less for healthier enrollees expected to incur lower costs.

29. Dr. Mohan fraudulently billed CCM to Medicare Advantage plans, which inflated their costs and ultimately caused the Government to pay more for their care.

**Tricare (Background)**

30. At all relevant times, Tricare/Champus regulations were substantially identical to the Medicare regulations discussed in this Complaint.

**Medicare Certifications (Background)**

31. Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

32. To participate in the Medicare program, providers must submit a Medicare Enrollment Application, Form CMS-855B. These entities must also complete Form CMS-855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment.

33. Form CMS 855B requires signatories to certify that they "agree to abide by the Medicare laws, regulations and program instructions that apply" and "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law)." An authorized official must sign the "Certification Section" in Section

10

15 of Form CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program."

34.     Medicare pays "claims," which are requests by a health care provider to be reimbursed (paid) for services provided to Medicare recipients. A claim contains a variety of information, including where the medical service was provided, the dollar amount being billed to Medicare, and an identification number for the health care provider (such as a physician).

35.     When submitting claims to Medicare, providers certify on the CMS 1500, *inter alia*, that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the Federal Anti-Kickback Statute and Physician Self-Referral law (commonly known as the Stark Law)."

36.     Generally, once a provider submits a CMS 1500, or the electronic equivalent, to the Medicare program, the claim is paid directly to the provider, in reliance on the foregoing certifications, without review of supporting documentation.

**Medicare Hospice Benefit (Background)**

37.     Through the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, the United States provides health insurance coverage for eligible citizens. The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.

38.     Medicare pays for certain hospice services for qualified individuals. *See* 42 U.S.C. §§ 1395f, 1395x; 42 C.F.R. §§ 418.20 *et seq*. This benefit is known as the Medicare Hospice Benefit.

39.    To be eligible under federal law to receive hospice care, the Medicare Hospice Benefit requires written certification to Medicare by a physician or hospice medical director that a patient has been diagnosed as terminally ill (life expectancy of six months or less).

40.    Regulations require that clinical information and other documentation supporting the medical prognosis of a hospice patient be filed in the medical record with the written certification of terminal illness.

41.    Regulations allow for continual recertification (as terminally ill) of hospice patients who survive. *See* 75 Fed. Reg. 70488 (Nov. 17, 2010). Hospice providers may collect reimbursement from Medicare for an unlimited number of recertification periods. *See* 42 U.S.C. § 1395d(d)(1).

42.    Medicare pays hospice providers on a per patient/per day basis.

43.    A hospice provider generally does not see patients at its own facility; rather, its employees visit patients at the patient's home, or (rarely) at a hospital. Routine Home Care ("Routine") visits are to a patient's home or nursing home. General Inpatient ("GIP") visits are to a patient in a hospital.

44.    Routine patients are required by Medicare regulations to be visited at least once every fourteen days. Hospice providers receive the same per patient/per day payment from Medicare no matter if a Routine patient is visited every day or only once every fourteen days. Put differently, hospice providers are not paid per visit.

45.    Medicare pays hospice providers $192.08/day ($5,762/month) for each Routine patient.

**UNNECESSARY OR WORTHLESS SERVICES (Background)**

12

46. Medicare pays "claims," which are requests by a health care provider to be reimbursed (paid) for services provided to Medicare recipients. A claim contains a variety of information, including where the medical service was provided, the dollar amount being billed to Medicare, and an identification number for the health care provider (such as a physician).

47. A claim also contains a code for the procedure or service performed. Those codes are called the "CPT codes," which stands for Current Procedural Terminology codes. CPT codes are a national uniform coding structure created for use in billing and overseen by the American Medical Association. They are used by all health insurance companies and by Medicare and Medicaid. A code represents at least two things: the procedure/service performed and the complexity level involved.

48. Generally, for any given category of procedure, the more complex the procedure, the higher the number used for its code. In turn, a higher CPT code generally receives more reimbursement amount from Medicare.

49. Medicare only pays for services that are reasonable and necessary for the diagnosis or treatment of illness or injury to improve the functioning of a malformed body member. 42 U.S.C. §1395y(a)(1)(A).

50. Fraud can occur when a physician performs a more complex procedure than is medically unnecessary in order to intentionally generate larger Medicare reimbursements.

51. The False Claims Act also imposes liability for so-called worthless services; that is, healthcare services that are so poorly delivered as to amount to no services at all. *See, e.g., Hagood v. Sonoma County Water Agency*, 81 F.3d 1465 (9th Cir. 1996); *United States v. Houser*, 754 F.3d 1335 (11th Cir. 2014); *Chesbrough v. VPA, P.C.*, 655 F.3d 461 (6th Cir.2011); *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001).

**ANTIKICKBACK STATUTE (Background)**

52.     The Anti-Kickback Statute ("AKS") prohibits the payment of kickbacks in order to protect the integrity of Medicare and other federal health care programs (including Medicaid). *See* Social Security Amendments of 1972, Pub. L. No. 92-603, § 242(b)-(c), 86 Stat. 1329, 1419-20; 42 U.S.C. § 1320a-7b; Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, 91 Stat. 1175 (1977); Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93, 101 Stat 680.

53.     The AKS prohibits any person or entity from soliciting, receiving, offering, or paying any remuneration as an inducement or reward for referring, recommending, ordering, or arranging for the purchase of any item or service for which payment may be made in whole or in part by a federal health care program. 42 U.S.C. § 1320a-7b(b).

54.     Subject to specified exceptions, the AKS prohibits offering or paying any remuneration that has, as one purpose, inducement of a provider's referrals to federal health care programs. Claims that include items or services resulting from a violation of the AKS are false or fraudulent under the FCA. 42 U.S.C. § 1320a-7b(g); *see also, e.g., United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 498 n.2 (D.S.C. 2016) (collecting cases).

**UPCODING (Background)**

55.     Medicare pays "claims," which are requests by a health care provider to be reimbursed (paid) for services provided to Medicare recipients. A claim contains a variety of information, including where the medical service was provided, the dollar amount being billed to Medicare, and an identification number for the health care provider (such as a physician).

56.     A claim also contains a code for the procedure or service performed. Those codes are called the "CPT codes," which stands for Current Procedural Terminology codes. CPT codes

are a national uniform coding structure created for use in billing and overseen by the American Medical Association. They are used by all health insurance companies and by Medicare and Medicaid. A code represents at least two things: the procedure/service performed and the complexity level involved.

57. Generally, for any given category of procedure, the more complex the procedure, the higher the number used for its code. In turn, a higher CPT code generally receives more reimbursement amount from Medicare.

58. Fraud can occur when a physician intentionally uses a CPT code that does not describe the services the physician actually provided in order to intentionally generate larger, unearned Medicare reimbursements. This type of fraud is called "upcoding."

<strong><u>DEFENDANT'S FRADULENT PRACTICES</u></strong>

59. This complaint is based on the following fraudulent practices by Defendants.

**A. FRAUDULENT BILLING FOR CCM SERVICES**

60. Medicare pays for chronic care management (CCM) services rendered each month to qualifying patients. These management and support services are provided by clinical staff under the direction of a physician or other qualified health care professional. Services include monitoring the patient's care plan and medications, coordinating care with other professionals, and educating the patient about their condition and prognosis.[1]

61. In order for a patient to qualify for CCM services, the patient must have two or more chronic conditions that are expected to last more than 12 months or until the patient's death, or that place the patient at "significant risk of death, acute exacerbation or decomposition or

---

[1] See https://www.cms.gov/outreach-and-education/medicare-learning-networkmln/mlnproducts/downloads/chroniccaremanagement.pdf.

functional decline."[2] Before CCM services can start, the provider must have an initial face to-face visit. If the provider does not discuss CCM services at that initial visit then the office visit does not meet the initial face-to-face visit requirements.[3]

62.     CCM may be billed as noncomplex (under CPT Code 99490) or complex (under codes 99487, and modifier 99489 for each additional 30 minutes spent). The two types of services differ as to the amount of clinical staff service time provided, the complexity of medical decision making, and the nature of care planning that was performed. For example, non-complex CCM (CPT Code 99490) involves 20 minutes of service time per month. Complex CCM (CPT Code 99487) requires at least 60 minutes. A typical bill for complex CCM can exceed $200 per month.

63.     To pay for CCM Services, Medicare requires that a patient give informed consent to the provision of CCM services. One reason consent is important is because the patient must pay towards their deductible and associated co-pays for the services, which can cost the patient up to $100 per month. Medicare also requires that the provider adequately document the provision of CCM services in a patient's notes.

**Dr. Mohan's Fraudulently Enrolls Patients In CCM Plans**

64.     Shortly after Medicare began paying for complex CCM in 2017, Dr. Mohan began exploiting the system to fraudulently inflate his reimbursements from Medicare. This fraudulent CCM billing scheme plays out in several steps.

---

[2] See id. See also https://www.healthline.com/health/medicare/medicare-chronic-caremanagement.

[3] https://www.cms.gov/outreach-and-education/medicare-learningnetwork-mln/mlnproducts/downloads/chroniccaremanagement.pdf at 5.

16

65.     *First*, Dr. Mohan sends nurse practitioners (often Hila Oren or Amy Sargent) to visit skilled nursing facilities (SNFs), nursing homes, and assisted living facilities (ALFs), memory care facilities, and independent living facilities throughout Georgia, South Carolina, and Indiana.[4]

66.     *Second*, the nurse practitioner induces the patient to sign a form in order to initiate a relationship with a provider. The form states that the patient consents for services to be rendered and billed to insurance, and also states that the patient consents to chronic care management. Consent to CCM is not optional. For patients in skilled nursing facilities (or long term care facilities), who generally do not sign consent forms, a template provider note states that the patient gave "verbal consent" to CCM. Many patients have cognitive impairments that prevent them from legally giving consent for CCM services, and at any rate, consent to CCM is often not even mentioned during this initial visit.

67.     *Third*, after signing up, all that is left is for Dr. Mohan to begin billing Medicare for CCM services each month. Nothing close to what is required to bill for such services—and usually no service at all—is actually provided. As Dr. Mohan once put it: "If they're under our services, we're billing CCM."

**Fraudulent Templated Notes Documenting Supposed CCM Services**

68.     After a patient is enrolled in CCM services, a patient note is auto-generated each month using a template. Previously, a medical assistant would have to manually open each note to insert the template, but since July of 2020, Defendants have automated the process so that a "bot" opens thousands of notes at once and populates them with templated, false information. The template note states that various services were provided to the patient and states the number of

---

[4] For example, in Rockdale Health Care Center (Covington, GA), Sterling Estates of West Cobb (Marietta, GA), and Dublinair Health Care & Rehab (Dublin, GA) are places where Defendants have enrolled patients for CCM.

minutes those services took. These statements also are false: services were not provided, and services that took less than one minute are reported as having taken ten, fifteen, or twenty minutes.

  a. For example, the template states that each communication via the patient monitoring application (SamePageMD)—most of which do not even qualify as CCM-related—took five minutes per communication.

  b. For another example, the template states that patient reports were reviewed for three to five minutes per patient per day. In reality, no reports were reviewed. Instead, medical assistants use providers' credentials to download bulk reports (e.g., of progress notes or vitals) from facilities and then upload them into a Google Drive folder. The entire download—which may involve reports regarding dozens of patients—takes approximately five minutes in total. Dr. Mohan has expressly stated that the purpose of these downloads is to "pass Medicare audits."

69. Dr. Mohan has instituted a policy whereby prescriptions are generally refilled only for 14-day supplies, regardless of need. The express purpose of this policy is to drive up CCM time (it ensures multiple refills per month to be included in patient notes); it serves no medical purpose.

70. Fraudulently inflating the time spent on monthly CCM services allows Dr. Mohan to bill for complex CCM (under codes 99487 and 99489 for each additional 30 minutes spent after the first 20 minutes).

71. The patient note is signed by a physician. For six years, until approximately July of 2023, all notes stated that the patient was "seen by Amar Mohan," which was false. In fact, Dr. Mohan largely discontinued rounding in approximately 2020 (and now lives primarily in North Carolina). Dr. Mohan instructed the signing providers (generally, Dr. Faizan Shaikh; Dr. Vamsi

Kanagala; and Dr. Albert Warren) that it was a requirement of their job to sign these notes. So, for example, in 2022 Dr. Mohan credited himself with and falsely billed to Medicare more than 10,000 instances of CPT Code 99487 (for provision of complex CCM services). This fraudulent CCM billing accelerated in 2023.

72. Since July of 2023, some notes state that the provider signing the note saw the patient, while others state that Dr. Mohan saw the patient. This change has allowed Dr. Mohan to maintain and expand his fraudulent scheme while reducing his exposure to an audit.

73. Dr. Mohan is currently developing a process whereby notes can be "bulk signed" using a bot, after which his employee physicians will not even have to glance at the notes as they "sign" them.

**Specific Examples of Fraudulent Billing related to CCM**

74. Below are examples of just two patients for whom Defendants fraudulently billed Medicare for CCM services under the scheme that is the subject of this complaint. There are hundreds or thousands of similar examples in Defendants' records:

**Patient E** (traditional Medicare, PRN Exxxxxx6):

 a. Patient E has been one of Defendant's CCM patients since the beginning of the program. Patient E resides in a Skilled Nursing Facility (SNF) in Covington, GA. Patient E did not consent to CCM services.

 b. Example dates of service/bill: 01/31/24; 02/29/24; 03/31/24; 04/30/24; 05/31/24; 06/30/24; 07/30/24.

 c. Each of the notes supporting these bills contain the same templated activities that were prepared and entered into the note by the "bot" described in this Complaint

(see below, beginning "The back office practice (LPN's, MA'), MD's, and NP's were involved in chronic care management . . . .").

d. In reality, none of these templated activities occurred. No care plans were created or reviewed by TCPA providers or discussed with Patient E.[5]

e. The template also includes a space for a total time figure to be entered. This templated language begins "At least ___ minutes of clinical staff time . . . ." The total time is auto-generated based on a formula that does not (in intent or effect) reflect actual time spent on actual tasks performed.

f. In the 01/31/24 note, Defendants purported to spend 122 minutes on CCM services. This number is false. For SNF patients, the template assigns three minutes per day, five days per week, four weeks per month (60 minutes) to an MA for templated activities which were not performed; plus 5 minutes per communication and 10 minutes per prescription-related event harvested from the patient's portal (here, adding up to 60 minutes).[6] The formula then adds any non-templated time entry entered at the beginning of the note (here, 2 minutes by Dr. Warren reviewing medications) to generate a total time entry for the bill: here, 122 minutes.

g. Each of the notes for the subsequent months contain similarly inflated, formula-arrived, false time figures to support a complex CCM bill (with additional time

---

[5] Patient care plans related to SNF requirements are created by the nursing staff of the SNF (not Defendants) and are updated annually or quarterly. They are not updated monthly and have nothing to do with Defendants or CCM. Dr Mohan instructed staff to "download a copy of the facilities care plan" from the SNF EHR to put into the HER to create the appearance of work by Defendants.
[6] Over time Dr. Mohan has altered these template figures, never to correspond to actual time spent.

modifiers): 02/29/24 (112 minutes); 03/31/2024 (102 minutes); 04/30/24 (95 minutes); 05/31/24 (99 minutes); 06/30/24 (137 minutes); 07/31/24 (216 minutes).

Patient D (traditional Medicare, PRN Mxxxxxx2):

a. Patient D is an SNF patient in Vidalia, GA. In Defendants' initial ("H&P") visit note for Patient D, Defendants' template falsely stated that verbal consent to CCM services was obtained.

b. The notes state that Patient D was "seen by" Dr. Mohan, which is false. Dr. Shaikh is the signatory on the note.

c. Example dates of service/bill: 02/28/22; 03/31/22; and 04/31/22.

d. Each of the notes supporting these bills contain the same templated activities that were prepared and entered into the note by the "bot" described in this Complaint (see below, beginning "The back office practice (LPN's, MA'), MD's, and NP's were involved in chronic care management . . . .")

e. These activities did not occur. The template for this patient further falsely states that Britny Catlett (Relator) performed "daily review" tasks.

h. For the 02/28/22 note, Defendants falsely stated that three separate physicians (Doctors Shaikh, Kangala, and Taylor) collectively spent 52.5 minutes that month reviewing the appropriateness of Patient D for his prescribed medication (and refills),[7] and a nurse spent 3 minutes calling about a missing prescription. Under the formula, these 55.5 minutes were added to templated activity (60 minutes

---

[7] To be clear, these physicians are not making these time entries; they are entered by the back-office staff, whom Dr. Mohan has instructed to include physician names.

21

purportedly by Ms. Catlett) and harvested activities (100 minutes) to arrive at a 205.5 minute total time spent on CCM.

i.  Defendants fraudulently submitted bills to Medicare for Patient D's care supposedly supported by this 02/28/22 note using CPT codes 99487 and 99489. Defendants charged $138.00 and $201 (respectively) and Medicare paid $133.77 and $201.00 on these charges.

j.  Each of the notes for Patient D for the subsequent months contain similarly inflated, formula-arrived, false time figures to support a complex CCM bill (with additional time modifiers): 03/31/2022 (130 minutes); and 04/30/22 (260 minutes). Using CPT Codes 99487 and 99489, Defendants fraudulently submitted charges to Medicare for Patient D's care for these months as follows: 03/31/22 (Defendants charged $201 for 99487 and $210 for 99489; Medicare paid $133.77 and $140.60); and 04/30/22 (charged $201 and $315; Medicare paid $132.70 and $209.21).

75.     Below is how the templated activities appear on the notes for 2024 patients such as

Patient E. The templated activities for 2022 patients such as Patient D are nearly identical, but less

verbose:

**The back office practice (LPN's, MA'), MD's, and NP's were involved in chronic care management and the following were reviewed during the calendar month**
- chronic medical problems listed in active Dx list
- Medication adherence
- Medication reconciliation and evaluation for poly-pharmacy
- Blood pressure Log and monitoring
- Lab and lab trend review
- Blood Sugar log (when applicable)
- Need for refills (including controlled substances when applicable)
- Acute care issues that would, if left untreated, place the patient at harm and or exacerbate chronic medical illness and with correspondences attached to this encounter
- Review of facility EMR to assess and review nursing notes, dietician notes, PT notes
- Patient specific treatment plan as noted in MD/NP visits

**Functional status since last month reviewed and discussed with provider and documented in monthly encounter**

**Cognitive status since last month has reviewed and discussed with provider and documented in monthly encounter**

**Environmental evaluation was completed and noted to be: Fair and appropriate**

**Prognosis reviewed and long term prognosis is difficult to assess given confounders, however, it is noted to be: Guarded**

**Preventative and screening services reviewed and appropriate**

**Coordination of care with home and community based clinical service providers was performed and the following providers were identified:**
- Nursing Staff
- Personal Caregivers
- Physical Therapist (When applicable)
- Consultant providers (Pharmacy, psych, etc)

**Daily review of nursing reports from facility EHR was performed for all patients in facilities using PCC**

Plan of care discussed with: Billing and signing MD and NP assigned to case as listed in chart for acute visits and associated nursing staff and/or caregiver assisting in management of patient

**Patient invited to web portal with email address on file when applicable in profile**

**Chronic care management services were discussed with the patient who was given the opportunity to accept/decline the service and explanation of revocation of service was provided. Acceptance of services was noted. Patient was informed that only one practitioner can furnish and be paid for chronic care management services during a calendar month. A copy of the care plan was made available to the patient and discussed/given to patient/caregiver**

23

**Physicians Are Paid Kickbacks ("CCM Bonuses") To Encourage Participation in the Fraudulent CCM Scheme**

76. After a change of policy in July of 2023, template notes generally state that the provider signing the note saw the patient (occasionally a note will state that Dr. Mohan saw the patient even though it is signed by another physician). Beginning in 2024, Dr. Mohan paid a percentage of the money he (through the provider entities) received from Medicare related to CCM codes ("receivables") to the physicians who signed his template notes. These payments are generally referred to (including by Dr. Mohan, Amy Sargent and others) as "CCM quarterly bonuses." These were kickbacks. Relator has produced to the Government numerous internal emails documenting payment of these kickbacks. Dr. Mohan has also stated to physicians that CCM bonuses are compensation for performing general (non-CCM) administrative tasks for him.

77. Under the "Regional MD Model," providers are paid a bonus check quarterly for billing CCM, with higher payouts for the higher quantity and higher complexity that they bill, with a "benchmark" set each quarter. These providers are part of the following regional teams: Northeast (led by Dr. Kanagala and Amy Sargent, NP), Northwest (led by Dr. Shaikh and Hila Oren, NP), and South (led by Dr. Warren and Shannon Coffee NP). The leaders of the regional teams are paid larger quarterly bonuses (as much as $30,000) for ensuring their teams of providers are signing and billing the most CCM notes possible.

**B. UPCODING**

**Fraudulent Use of CPT Code 99310 (and related codes)**

78. Medicare will pay for federally mandated visits that monitor and evaluate residents of Skilled Nursing Facilities (SNF) at least once every 30 days for the first 90 days after admission and at least once every 60 days thereafter. Medicare allows only the medically necessary portion of a face-to-face visit to be billed. Depending upon the complexity and time of the visit, providers

may bill CPT codes 99307 (least time/complexity) to 99310 (most time/complexity). CPT Code 99307 involves a ten-minute problem-focused exam, straightforward medical decisionmaking, and a stable or improving problem. The most intensive and highest reimbursing code, CPT Code 99310, requires a comprehensive history and exam, high medical decision making, an unstable or significant new problem requiring immediate physician attention, and generally lasts at least 35 minutes.

79.     On average, Medicare reimburses a CPT Code 99310 visit approximately $150 per visit.

80.     Since 2017, Providers working for TCP, CDM, and the SIP Care entities have frequently made routine visits to patients at skilled nursing facilities (SNFs) in Georgia and South Carolina. As just a few examples, these visits included visits to Riverside Healthcare Center (in Covington, GA); Rockdale Healthcare Center (in Conyers, GA); and Willow Brook Court at Park Point Village (in Rock Hill, South Carolina). During the COVID pandemic, many of these routine visits were performed remotely (i.e., were telehealth visits).

81.     From approximately 2017 to late 2023, Dr. Mohan implemented a policy whereby virtually all visits with patients at SNFs were automatically billed at the highest complexity using CPT Code 99310, no matter if a visit was necessary and no matter how long it took. For example, a provider who performed a brief rounding session at an SNF and did little more than greet patients would fraudulently bill CPT 99310 for each separate interaction. As a means of effectuating this policy, Dr. Mohan included CPT Code 99310 in the template (and "bot-prepped") notes that providers used.

82.     Relators are providing the Government a non-exhaustive list of some of the highest-producing providers who improperly billed CPT Code 99310 pursuant to this fraudulent policy.

83. Moreover, telehealth visits (which did not qualify for reimbursement under CPT Code 99310 or required a modifier) were billed as if they took place at the facility or in an office, which caused them to be more highly reimbursed.

84. The equivalent related high-complexity code for visits to non-SNFs (such as Assisted Living Facilities (ALF) and home visits) is CPT Code 99350 ("Home" code at highest complexity); Medicare previously allowed 99337 (for ALF) but now allows 99350 instead. Defendants used the same fraudulent policies described above to bill for routine non-SNF (largely ALF) visits by NP Hila Oren and fraudulently billed 99337 and 99350. Aa an example, one such ALF that Defendants committed these fraudulent acts is Wesley Court in Boiling Springs, South Carolina.

## C. KICKBACKS AND FRAUDULENT REFERRALS

### Dr. Mohan Fraudulently Refers Himself Hospice Patients And Pays Kickbacks To His Referral Source

85. Dr. Mohan also defrauds Medicare by violating federal law to obtain referrals to his hospice company, Defendant Providence Hospice (formerly Defendant Pathways Hospice).

86. Providence Hospice is in Monroe, Georgia, and has an average census of approximately forty-five patients. Dr. Mohan owned Pathways Hospice, the entity that operates Providence Hospice, until January of 2023. He remains affiliated with Providence Hospice as its "Chief Operations Officer" and "Chief of Innovation."

87. In June of 2024, Dr. Mohan was unhappy with Providence's census and decided to hire an additional employee to boost referrals. Dr. Mohan hired an NP specializing in internal medicine whom he had previously employed, Ashley Head. Ms. Head visits Transitional Care Physicians patients and other patients at skilled nursing facilities, nursing homes, and assisted living or memory care facilities, and refers them to Providence Hospice.

88.      Because a hospice provider cannot legally refer patients to the hospice who employs her, Dr. Mohan caused TCP (in June of 2024) to hire Ashley Head. In reality, Ashley Head works as a referral source for Providence Hospice and reports to its general manager (currently Carolyn Grinner, previously Pressley Waddell). Ms. Head maintains her daily work at the Providence Hospice office in Monroe, Georgia. Her primary method of communication is through her Providence email address. Ms. Head is paid kickbacks (called "productivity" bonuses) by TCP based on her referrals to Providence Hospice—an arrangement that only makes sense in the context of this fraudulent scheme.

89.      This scheme functions to put Dr. Mohan on both sides of the equation for referrals to Providence Hospice: through Ms. Head, he refers his own and other patients to his own hospice.

## COUNT ONE: FALSE CLAIMS

90.      Relators adopt and incorporate the previous paragraphs as though fully set forth herein. This count is against all Defendants except InTandem.

91.      By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as follows:

   a.  Defendants fraudulently billed Medicare for CCM services that were not provided; and

   b.  Defendants fraudulently upcoded SNF (and other) visits.

92.      The United States paid the false claims described herein.

93.      Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to

the United States through fraudulent use of codes and fraudulent billing of the United States through Medicare.

94. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

95. WHEREFORE, Relators demand judgment in Relators' favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT TWO: FALSE RECORDS

96. Relator adopts and incorporates the factual allegations contained in the previous paragraphs (except those in Count One) as though fully set forth herein. This count is against all Defendants except InTandem.

97. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States in that Defendant fraudulently used the coding system and other false records intended to support its fraudulent billing to the United States, all in violation of federal statutes and regulations.

98. The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendant to the United States.

99.     In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

100.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

101.    WHEREFORE, Relators demands judgment in Relators' favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT THREE: REVERSE FALSE CLAIMS

102.    Relator adopts and incorporates the factual allegations contained in the previous paragraphs (except those in previous counts) as though fully set forth herein. This count is against all Defendants except InTandem.

103.    By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States.

104.    Defendant knew that it had received inflated Medicare payments based on inaccurate and falsified coding, yet Defendant took no action to satisfy its obligations to the United

29

States to repay or refund those payments and instead retained the funds and continued to bill the United States.

105.   As a result of Defendant's fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

106.   WHEREFORE, Relators demand judgment in Relators' favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

**COUNT FOUR: AKS VIOLATION AS FCA PREDICATE**

107.   Relator adopts and incorporates the factual allegations contained in the previous paragraphs (except those in previous counts) as though fully set forth herein. This count is against all Defendants except InTandem.

108.   Defendants' submission of Medicare claims were rendered in violation of the Anti-Kickback Statute ("AKS") for federal health care programs, 42 U.S.C. § 1320a–7b, because Defendants entered into improper financial relationships with and gave kickbacks to:

a.   Ms. Head in order to induce them to refer patients to Providence Hospice;

b.   Providers associated with the Defendant entities to induce them to participate in CCM fraud.

109.   Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to

30

the United States through illegal referrals and fraudulent billing of the United States through Medicare.

110. Because compliance with the AKS is a material consideration for Medicare, the claims Defendants submitted for services rendered in violation of these statutes were "false or fraudulent" for purposes of the FCA.

111. WHEREFORE, Relators demand judgment in Relators' favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

**COUNT FIVE: CONSPIRACY**

112. Relator adopts and incorporates the factual allegations contained in the previous paragraphs as though fully set forth herein. The previous counts describe the fraud for which Defendants are charged in this count with conspiracy to perpetuate. This count is against all Defendants, including InTandem.

113. Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval through the fraudulent use of reimbursement codes, and presented or caused to be presented false claims to the United States through Medicare or Medicaid for payment of same.

114. The United States paid Defendants for such false claims.

115. Defendants, in concert with each other and their agents, employees, subsidiaries, and other institutions (including InTandem) did agree to submit such false claims to the United States.

31

116.    Defendants and their principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare.

117.    Defendants' fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Defendants and others because of Defendants' fraudulent claims.

118.    WHEREFORE, Relators demand judgment in Relators' favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT SIX: RETALIATION

119.    Ms. Catlett adopts and incorporates the factual allegations contained in the previous paragraphs (except those in previous counts) as though fully set forth herein. This count is against Defendants Dr. Mohan and SIP Care Management of Georgia, the entity that employed Ms. Catlett.

120.    Ms. Catlett engaged in conduct protected under the False Claims Act's anti-retaliation provision. Approximately a year and a half ago, Ms. Catlett discovered that she was being listed as the treating LPN on the template used to generate patient notes and complained to Dr Mohan; Dr. Jindal (previous Chief Medical Officer); and Kelly Murray (Chief of Compliance). Dr. Mohan responded by removing her name from the template but otherwise continuing the fraud. Ms. Catlett has also repeatedly complained that patients are not allowed to opt out of CCM (*i.e.*, refuse their consent), that they have not consented to CCM, and that the time recorded as spent on

CCM services is grossly inflated and/or entirely fictional, conduct that constitutes fraud and violates the FCA.

121. In November of 2024, Ms. Catlett reiterated her complaints about Defendants' fraudulent practices and resigned because of them, but Defendants convinced Ms. Catlett to return to work by promising changes. These changes were never implemented, and Ms. Catlett resigned again in January of 2025. This time Dr. Mohan responded by sending Ms. Catlett threatening messages; suggesting that she would be prosecuted if she reported Defendants' fraudulent practices; and defaming her by spreading word to colleagues (and potential employers) that she is a "liar" and not to be trusted and that she is under investigation.

122. In early 2025, including in March of 2025, various former colleagues of Ms. Catlett reached out to her. During those conversations, Ms. Catlett reiterated her longstanding position that Defendants had engaged in fraudulent practices and violated the law.

123. On information and belief, Defendants learned of these conversations in early/March 2025 and further retaliated. On March 20, 2024, Defendants caused an attorney to send a threatening letter to Ms. Catlett by email, accusing her of interfering with their business and other false accusations, demanding that she take various actions to further Defendants' interests, and threatening immediate legal action if she did not respond within five days.

124. Those retaliatory actions violated the False Claims Act's anti-retaliation provision.

125. Ms. Catlett suffered loss of income, reputation, and other financial damages and mental anguish because of Defendant's retaliatory actions. Ms. Catlett was also required to procure and pay for legal services related to Defendants' retaliatory threats of legal action in March of 2025.

126. WHEREFORE, Relator demands judgment in Relator's favor and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by law, attorneys' fees, costs, interest, and such other, different, or further relief to which Relator may be entitled.

## COUNT SEVEN: RETALIATION

127. Mr. Catlett adopts and incorporates the factual allegations contained in the previous paragraphs (except those in previous counts, but including those in Count Six) as though fully set forth herein. This count is against Defendants Dr. Mohan and SIP Care Management of Georgia, the entity that employed Mr. Catlett.

128. On Monday, March 3, 2025, the Chief of Compliance (Kelly Murray) of SIP Care sent Mr. Chris Catlett an email stating that he had one hour to call her or he would be considered to have resigned from the company. By the time Mr. Catlett saw the email and attempted to respond, he had been locked out of his email account and his employment had been terminated. This was retaliation for his involvement in the preparation of his complaint and for his wife's outspokenness about the fact that Defendants were fraudulently violating the law.

129. WHEREFORE, Relator demands judgment in Relator's favor and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by law, attorneys' fees, costs, interest, and such other, different, or further relief to which Relator may be entitled.

## JURY DEMAND

130. Relators, on behalf of themselves and the Government, demand a jury trial on all claims alleged.

*[signature on following page]*

34

/s/ Brian C. Duffy
Brian C. Duffy
DUFFY & YOUNG, LLC
96 Broad Street
Charleston, SC 29401
Phone: 843.720.2044
bduffy@duffyandyoung.com

Oscar M. Price, IV (*pro hac forthcoming*)
T. Graham Cotten (*pro hac forthcoming*)
PRICE ARMSTRONG, LLC
1919 Cahaba Road
Birmingham, AL 35223
Phone: 205.208.9525
oscar@pricearmstrong.com
graham@pricearmstrong.com

March 26, 2025
Charleston, South Carolina